Washburn County vs. Thompson and others.

WASHBURN COUNTY, Respondent, vs. THOMPSON and others, imp., Appellants.

*May 4 — May 24, 1898.*

*County board, power to settle doubtful claims: Bond, consideration for: Pleading defense.*

| 99 | 585 |
| 104 | 439, |
| 99 | 585 |
| 114 | 115 |
| 99 | 585 |
| 117 | 2 75 |

The county of Washburn, having a judgment against its treasurer and his bondsmen for money lost through depositing the same in an insolvent bank, and having exhausted all legal remedies to collect the same, and the assets of the bank being in the hands of an assignee under a voluntary assignment for the benefit of creditors, and the treasurer having conveyed to the county his claim against such bank for the public money deposited therein and lost as aforesaid, which claim the county held as security for the payment of the judgment, the county board took the bond of the bank, with sureties, to secure the payment of such collateral claim in one year, and as consideration therefor, named in the bond, gave that time to the bank in which to pay such indebtedness. *Held:*

(1) That all legal remedies having been exhausted to collect the judgment, under express statutes on the subject, the duty to. make further efforts to collect it devolved on the county board,.

and to that end such board possessed express authority to make such contracts and do such acts as in its wisdom were necessary and proper.

(2) That the power of the county board under the statute was sufficiently broad to enable it to apply to the situation the rules of business conduct by which a prudent person is ordinarily governed under similar circumstances in his private affairs.

(3) That the doctrine that the governing body of a corporation nas no power to discharge a debt due to it without payment, does not apply to debts of questionable validity before final judgment, or debts against insolvent parties after judgment.

(4) That though a municipal board must confine its operations to the powers conferred upon it by law, and has no power to squander or give away corporate property or discharge debts against a solvent party, it may settle disputed or doubtful claims as an incident to the right to maintain and defend actions, as well as under the express power conferred by statute to make such contracts and do such acts as are deemed necessary and proper to the exercise of the powers and privileges granted to, and duties charged upon, counties.

(5) That the giving of time, without interest, for the payment in one year of a claim of doubtful collectibility, in consideration of a bond with sureties, for payment at that time, is sufficient consideration to support such bond.

(6) That the fact that members of the county board who voted in favor of taking the bond were interested in giving the bank time to pay its indebtedness, if a defense to an action on the bond, is not available unless pleaded and insisted on as such.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Washburn county: A. J. VINJE, Circuit Judge. *Affirmed.*

The action was to recover of the defendant Shell Lake Savings Bank, as principal, and the other defendants as sureties, $14,354.57 on a bond given by such bank to the plaintiff, with interest thereon from the 3d day of February, 1896. The complaint, in addition to a copy of the bond, contained appropriate allegations showing performance of all the conditions precedent to the right of the county to recover thereon if the bond was a valid obliga-

tion. The principal issues raised by the pleadings were:
(1) Was fraud perpetrated on the sureties by the officers of
the county in obtaining the bond? (2) Is the bond void for
want of authority on the part of the county board to accept
it under the circumstances?

The recitals in the bond were to the effect that $14,354.57
were theretofore deposited in the Shell Lake Savings Bank
by L. H. Wang, county treasurer of *Washburn* county; that
such money was received as, and in fact was, public funds
of said county; that while such money was so on deposit,
the bank suspended business and made a valid assignment
for the benefit of its creditors; that said moneys are wholly
unpaid and owing to said *Washburn* county and its treas-
urer; that the circuit court of said county has duly dis-
charged said assignee and his sureties, and directed a recon-
veyance of the property held by him as such assignee, to
the bank, to enable it to resume business; that a reassign-
ment has been made accordingly and the bank has resumed
business, and through its proper officers requested the
county and its treasurer to agree not to withdraw said
money from the bank till February 3, 1895. Appropriate
provisions were contained in the bond, binding the princi-
pal and sureties to pay the sum mentioned therein, to wit,
$14,354.57, in case the bank failed to pay the same on or
before the 3d day of February, 1895.

The issues formed by the complaint and answer were tried
by the court, and such trial resulted in there being filed find-
ings of fact to the effect that the bond sued on was taken as
a renewal of a former bond in substantially the same form,
with the same sureties, given on the 3d day of February,
1894, and that no fraud was practiced upon the sureties in
such bonds, by the officers of the county, to induce them to
become parties thereto. The circumstances on which the
question of whether the bond sued on is void for want of
power on the part of the county board to make the arrange-

ment it did with the Shell Lake Savings Bank, and take the bonds mentioned, as part of such arrangement, as found are as follows:

On the first Monday of January, 1893, and until January 5, 1894, L. H. Wang was the county treasurer of the plaintiff, and A. C. Probert, Joseph Riley, and F. C. Bailey were the sureties upon his official bond. June 7, 1893, the defendant bank, of which A. C. Probert was the president and principal owner, made a valid assignment to A. H. Earle for the benefit of its creditors. At the time of such assignment there was to the credit of said county treasurer, in said bank, $14,178.38 as state fund, representing moneys paid by the several town treasurers to the county as their respective portions of the state tax for the year 1893; and there was also to the treasurer's credit some $1,200 of other moneys. Such proceedings were had after such assignment that January 16, 1894, judgment was duly rendered in the circuit court for Washburn county against its treasurer and his bondsmen for the moneys due from the bank to the treasurer as aforesaid, with costs and penalties, aggregating $18,807.58. Transcripts of such judgment were duly docketed and executions issued thereon and duly returned wholly unsatisfied, no property being found out of which to satisfy the same or any part thereof. January 5, 1894, Wang resigned as county treasurer, and turned over to the county his claim against the bank for the aforesaid public money deposited therein, and he was thereupon re-elected county treasurer by the county board, but said bank indebtedness thereafter remained wholly under the control of the board as county property. February 3, 1894, Probert requested the county board of said county to extend the time of payment of said bank indebtedness, and to consent to a reassignment of the bank assets, and release him from the aforesaid judgment, so that the bank might resume business, on condition, among other things, of a bond in the sum of $14,354.57, signed by

Washburn County vs. Thompson and others.

the bank as principal, with *C. C. Thompson, F. J. Meehan, P. J. Pederson, George W. Harrison, R. D. Pike,* and *M. M. Hagerty* as sureties, being given to the county to secure payment to it of said sum of money on or before February 3, 1895, the bond to be void if the bank failed to resume business, and in that event the judgment against Wang and his bondsmen, rendered as aforesaid, to remain in full force and effect.

The request was presented in the form of a proposition, which was accepted by resolution of the county board duly adopted, and thereafter a bond proposed as aforesaid, to secure payment to the county of $14,354.57, signed by the Shell Lake Savings Bank through Probert, its president, and the other defendants named herein as sureties, was delivered to the board and duly accepted by it. Thereafter, consent having been given by all the creditors of the bank with the exception of the holders of a few small claims, the circuit court duly directed a reassignment to the bank of the property held by the assignee thereof, which was accordingly done, such property consisting of $8,000 in money and $78,515.17 of other assets. The claims against the bank at that time aggregated $68,706.06. February 3, 1895, after such reassignment, the bank resumed, and thereafter continued in business till the fall of 1895, when it suspended, being hopelessly insolvent. February 3, 1895, Probert, on behalf of the principal and sureties in the aforesaid bond, applied to the county board for an extension of the time of payment of the sum secured thereby till the 3d day of February, 1896, and such application was duly granted by a resolution of the county board duly adopted, in consideration of a renewal of the bond by the principal with the same sureties. The bond was renewed accordingly, the renewal bond being the one sued on in this case. The amount due on such bond is $14,354.57 with interest, amounting in all to $14,773.36, for which the plaintiff is entitled to judgment, with costs.

Judgment was entered accordingly, from which all of the defendants except the bank appealed on exceptions duly filed.

For the appellants there was a brief by *Lamoreux, Shea & Wright*, attorneys, and *Tomkins & Merrill* and *Spooner, Sanborn & Spooner*, of counsel, and a separate brief signed by *William F. Vilas*, of counsel, and oral argument by *A. L. Sanborn* and *Mr. Vilas*. They argued, *inter alia*, that the deposit of the county moneys in the bank did not change the title thereto, but they still belonged to the county, and the bank, and subsequently its assignee, held them as trustees for the county. *State v. McFetridge*, 84 Wis. 473. The lien of the county thereon was, under sec. 3245, R. S. 1878, prior to that of other creditors. The transaction in which the bond in suit was taken amounted to a loan of the moneys to the bank for a definite period, which the county board had no power to make. The powers of that board are limited. *Frederick v. Douglas Co.* 96 Wis. 411; *Board of Supervisors of Oconto Co. v. Hall*, 42 id. 59, 47 id. 208; *Butternut v. O'Malley*, 50 id. 329; *Butler v. Milwaukee*, 15 id. 497; *State v. Buttles' Ex'r*, 3 Ohio St. 309; *Nashville v. Sutherland & Co.* 92 Tenn. 335; *Thomas v. Richmond*, 12 Wall. 349. The loan was the only consideration of the bond, and that being *ultra vires* and void, the bond cannot be enforced. *Copper Miners' Co. v. Fox*, 16 Q. B. 229; *Mecorney v. Stanley*, 8 Cush. 85, 87; *Shadbourne v. Daly*, 76 Cal. 355, 359; *Bixler v. Ream*, 3 Pa. (P. & W.), 282; *Rix v. Adams*, 9 Vt. 233; *Jones v. Ashburnham*, 4 East, 445; *Nelson v. Serle*, 4 Mees. & W. 795; *Wade v. Simeon*, 15 L. J. C. P. (N. S.), 114.

*L. H. Mead*, district attorney, and *R. M. Bashford*, for the respondent.

MARSHALL, J. This appeal turns on the question of whether the bond sued on is a valid obligation, and that is subdivided into whether the county board had power, under the circum-

stances, to take the first bond, and whether there was sufficient consideration for it to bind the obligors. In considering the subject, if the antecedent propositions, taken as the groundwork for discussion and reasoning, are wrong, however logically and clearly the ultimate conclusion be reached, the fault existing at the start will necessarily be retained at the finish, and such result be of no value as an aid to a proper solution of the important legal question before us. If we could safely say the situation of the parties concerned in the transaction and the circumstances characterizing the final consummation of the agreement, of which the bond was an essential part, were as assumed by the distinguished counsel who very ably presented appellants' side of the case in this court, their conclusions would seem to be sound and based on quite familiar legal principles. But can we so say? There is the question that confronts us at the outset.

Appellants' counsel assume that when the first bond was taken there were $14,354.57 of public money, either in the Shell Lake Savings Bank or the hands of its assignee, which belonged to the county in its own right or as trustee for the state, and that the county board loaned that money to the bank for one year in consideration of the bond to secure its ultimate payment. "That was the sole consideration for the bond," say counsel; and they again say, "The pivotal question is, Do county boards possess lawful power under our laws to agree that moneys received by the county treasurer for taxes shall be loaned for use by a bank or other private person, for a year or such time as they shall please to grant?" When we view such assumed situation in the light of the undisputed facts of the case, as we understand them, the force of what we have already said, to the effect that right conclusions cannot be logically and safely reached unless we start with correct premises, is quite apparent.

At the time of the agreement to take the first bond, the county had a judgment against its treasurer and his bonds-

men, including $14,178.35 paid by the several town treasurers as their proportion of the state taxes for the year 1893, and not yet turned over to the state treasurer, and $1,241.61 of other county funds, all of which the county treasurer had lost through depositing the same in the Shell Lake Savings Bank. That judgment was *prima facie* uncollectible, all legal remedies to that end having been exhausted without realizing anything on it. The claim of the treasurer against the insolvent bank and its assignee, representing such moneys, had been transferred to the county and was county property, applicable when and as fast as collected, in discharge of the liability of the treasurer and his bondsmen on such judgment. There was no money in the hands of the assignee of the bank out of which to pay any considerable part of such claim. The county was a mere general creditor of the bank, having the right to participate in the distribution of the money realized out of its assets with other creditors, all representing debts of nearly $70,000. The amount realized by the assignee, after more than six months' handling of the matter, was but a little over ten per cent. of such indebtedness; hence the real value of the county claim against the bank was exceedingly uncertain. To summarize: The county owned a judgment against its treasurer and his bondsmen, each and all of whom were insolvent, and, as collateral thereto, a claim against an insolvent bank, no part of which was immediately collectible, and the ultimate value of which, and the time when such value would be realized by the county, was exceedingly uncertain. Under such circumstances, was it competent for the county board to release one of the bondsmen, the president of the insolvent bank, and consent to a reassignment to the bank, so it could resume business with some prospect of ultimately paying its indebtedness, suspend further proceedings to collect such judgment, and extend the time for the bank to pay the claim on condition of its giving a bond with sufficient sureties to

make reasonably certain the payment thereof at the end of
the extension period? The county did not have $14,175.35,
or any other sum of money, which its board undertook to
loan to private parties, as counsel assume, so the observation
that such board had no control over public money except to
apply it according to law, though true, does not apply to the
case before us. There was no such money to deal with. It
had been lost through the deposit of it in an insolvent bank,
and there was in its place a mere claim of doubtful value
against such bank and an insolvent county treasurer and his
insolvent bondsmen. How to recover the lost county funds
was the problem that confronted the county board and which
they dealt with in taking the bond. They did not resort to
the bond as a means of lending money to private persons,
but as a means of solving the problem stated, of recovering
public money that had been lost. A discussion by counsel
of the question whether the county board had, under such
circumstances, power to take the bond, would have been ap-
propriate and helpful, but candor compels us to say that we
have not received much light on the subject from their briefs
filed in the case.

True, if the county board possessed authority to take the
bond, it must be found in an express statutory power, or
some power necessarily incident to such an express power,
and there ought to be no serious difficulty in pointing out
its source in such an important matter. We will examine
that question.

Sec. 650, R. S. 1878, provides that a county may sue and
be sued, and make such contracts and do such acts as shall
be deemed necessary and proper to the exercise of the pow-
ers and privileges granted to, and the duties charged upon, it.
Sec. 652, R. S. 1878, provides that the powers granted to a
county shall be exercised by its county board. So whatever
powers are incident to the right to sue and be sued, and the
power to make whatever contracts and do whatever acts shall

be deemed necessary and proper to the exercise of the powers and privileges, and the duties charged upon a county, are exercisable by its county board.   It would seem to rest in sound reason and common sense, without judicial authority to support it, that the right to sue and be sued, in the conduct of corporate business, must necessarily carry with it the right to compromise and settle disputed or doubtful claims. Beach, in his work on Public Corporations (at §§ 638, 639), speaking on this subject, says, in substance: The law is well settled that public corporations have power to effect the compromise of claims in favor of or against them, and that such power is a necessary incident of the right to sue and be sued; that such power of compromise exists whether the corporation is a party plaintiff or defendant, and may be exercised at any time before the validity of the claim is fixed by final judgment, and afterwards in case of the insolvency of the debtor.   To the same effect is Dillon, Mun. Corp. § 477, and numerous cases in courts of the highest respectability cited by both text writers.   In *Agnew v. Brall*, 124 Ill. 312, the doctrine that the governing body of a corporation has no power to discharge a debt due to the corporation without payment, is expressly limited to cases where the debt is against parties who are solvent.   The court said, in effect, that while it is a plain proposition that the municipal board must confine its operations to the powers conferred by law, and that it has no power to squander or give away corporate property, or discharge a debt against a solvent and responsible party, it may settle disputed or doubtful claims, and that follows as an incident to the right to maintain and defend actions.

The following from the opinion of ADAMS, C. J., in *Collins v. Welch*, 58 Iowa, 72, is along the same line as the foregoing, and appears to touch this case unfavorably to appellants at every point: "It is true that where a claim has been reduced to judgment, all questions pertaining to the rightful-

ness of the claim have been adjudicated; but questions may arise subsequent to the rendition of judgment, and where they are of such a character as to render a compromise expedient, it is manifest that the board ought to have the power to make it.    Suppose, for instance, that the financial condition of the judgment debtor is such that the board is unable to discover any way of collecting any part of the judgment; the board should have the power to accept a part in satisfaction of the whole of its judgment, if thereby the best interests of the county would be promoted.    The rules of business conduct, by which a prudent person is governed, are applicable to a county in the management of its affairs under similar circumstances."    Certainly, if it be true that where a county has a claim against an insolvent public officer and his insolvent bondsmen, its governing board, charged with the duty of caring for its property and conducting its business affairs, in such cases is powerless to use the methods which ordinary prudence would dictate in the management of such business by a private person, then our system of county government is indeed most woefully weak in a material particular.    We are unable to hold that such weakness exists.    To our minds, the statutes referred to, and others hereafter cited, confer express power on the board to meet such situations.    In *Butternut v. O'Malley*, 50 Wis. 329, confidently cited by counsel, a far different question was presented.    The facts in that case were that a town board attempted to rebate a judgment affirmed by the court of last resort against persons whose solvency was not questioned. The court distinctly indicated in the opinion that the case was not governed by authorities to the effect that a corporation may compromise and settle disputed or doubtful claims.

Under sec. 984, R. S. 1878, it was the duty of the chairman of the county board to prosecute the claim against the treasurer and his bondsmen to judgment, and to see that all

legal remedies for its collection were exhausted. But beyond that the power to further proceed to collect the claim rested wholly with the county board if any power in that regard existed at all. No special provision of law exists lodging the duty anywhere else. Obviously, the county was not bound to lose its claim because the sheriff failed to collect the judgment on the executions. Now, sec. 669, subd. 6, comes in at this point and provides that the county board shall represent the county and have the care of the county property and the management of the business and concerns of the county in all cases *where no other provisions exist.* It follows necessarily that, after failure to collect the judgment on execution, the duty devolved on the board, under subd. 6 referred to, to represent the county and conduct its business in regard to such further efforts to collect the claim as in the judgment of the board were proper; and that under secs. 650, 652 the board was clothed with broad discretionary power to make such contracts and do such acts as in its wisdom were necessary and proper to the end that the county might finally recover the debt due to it.

So we reason easily up to the conclusion that the county board possessed express authority to take the bond of the Shell Lake Savings Bank, with appellants as sureties thereto, if done in good faith and deemed necessary by the board in the performance of its duties to collect the debt due from its treasurer and his bondsmen by realizing on the collateral claim against the bank. On the question of whether the board acted in good faith there can be no reasonable controversy, as that was in effect found by the court and was not excepted to. Not only good faith, but good business judgment, was exhibited by the board, if we are to test their conduct by the standard of ordinary prudence and business sagacity in the affairs of life.

But it is said there was no consideration for the bond; that the recitals show that the only consideration was a loan

of public funds to the bank,— an illegal proceeding render-
ing the whole transaction void. In the light of the circum-
stances under which the bond was taken, it is considered
that its language will not admit of the interpretation given
by appellants' counsel. The recitals show that there existed
a debt due from the bank to the county; that the bank was
insolvent; that its business was in process of settlement in
assignment proceedings for the benefit of creditors; that
the bond was given to secure consent of the county to a re-
assignment that the bank might resume business and ulti-
mately pay its debts, and one year's time was given the
bank for that purpose. True, the language of the bond is,
" The money shall not be withdrawn from said bank until
one year," but that, taken in connection with the recitals,
shows merely a condition that the bank was to have one
year's time to pay its debt. In our judgment such condi-
tion does not indicate, and should not be taken to mean,
that the money belonging to the county was then in the
bank or the hands of its assignee.

When we consider that the county was the owner of the
claim against the bank as a mere collateral to the payment
of the debt of its insolvent treasurer and his bondsmen,
against whom all legal remedies had been exhausted, and
that the bond was a means of securing the certain collection
of such collateral claim, instead of a loan of money by the
county to the bank, the arguments of counsel, made with
such learning and ability on the latter theory, lose all their
force. They do not touch the real situation, and we may safely
say that upon the correct theory of such situation, that is,
that the bond was given to secure the payment of a debt of
doubtful collectibility upon the consideration that the debtor
would be permitted to handle its property for the purpose
of paying such debt instead of having that done by an as-
signee and should have one year without interest to make
such payment, there can be no question as to the sufficiency

of the consideration to uphold the obligation, or as to the power of the county board to take it.

There is a further point made that several members of the county board were interested as creditors of the bank in having it resume business; that, counting out such interested members, a sufficient number did not participate in the proceedings and consent to the arrangement whereby the bond was taken, to make the action of the county board legal. Whether the appellants, on the facts, in any event could raise that question may well be doubted, but it is sufficient for this case to say that no defense on that ground was pleaded, or facts found by the trial court covering that situation, or exceptions taken to raise the question in this court.

The foregoing leaves nothing further that need be said. If the first bond was a valid obligation, and we hold that it was, the cancellation of it, and giving an additional term of one year to pay the debt of the bank, was ample consideration for the second bond, the one in suit.

*By the Court.*— The judgment of the circuit court is affirmed.